## IN THE MATTER OF THE ARBITRATION BETWEEN

| | |
|---|---|
| **DANA INCORPORATED, DANVILLE, KENTUCKY,** ) | |
| ) | |
| **Company,** ) | **BRANDON AKERMAN** |
| ) | **TERMINATION** |
| **and** ) | **GRIEVANCE** |
| ) | |
| **INTERNATIONAL UNION, UNITED** ) | **FMCS CASE NO. 190219-04331** |
| **AUTOMOBILE, AEROSPACE AND** ) | |
| **AGRICULTURAL IMPLEMENT** ) | |
| **WORKERS OF AMERICA (UAW),** ) | |
| **LOCAL UNION NO. 3062,** ) | |
| **Union.** ) | |

## DECISION AND ARBITRATION AWARD

Arbitrator:            Daniel M. Kininmonth
                                    Louisville, Kentucky

Hearing Date:       May 21, 2019

Location:             Holiday Inn Express
                                    200 Shannon Way
                                    Danville, Kentucky

                                    APPEARANCES

For the Company      Brian G. Dershaw
                                    Attorney
                                    Cincinnati, Ohio

For the Union          Mike Abell
                                    International Representative
                                    Lebanon, Tennessee



EXHIBIT
F

## I.

## **INTRODUCTION**

Local Union No. 3062, International Union, United Automobile, Aerospace and

Agricultural Implement Workers of America (UAW), hereinafter referred to as the Union is the

exclusive representative for production, maintenance, and skilled-trades positions employed by

Dana Incorporated, hereinafter referred to as the Company, at its facility located at 500

Techwood Drive, Danville, Kentucky. *(Joint Exhibit, hereinafter referred to as "J.E." No. 1, p.*

*11 and 29).*

The Union claims the Company's termination of Mr. Brandon Akerman, the Grievant, on

May 22, 2018 was not for just cause.  Grievant, the Union and the Company entered into a "last

chance agreement" on November 1, 2017.  The Company claims Grievant violated the LCA on

May 21, 2018 when he ignored his supervisor's directions to clean up his work area, failed to

perform his "5S" (daily maintenance standard) and update his "hour by hour board" in violation

of the Company's "General Plant Safety Rules and General Rules of Conduct," dated April 12,

2017 *(J.E. No. 5)* and the LCA, dated November 1, 2017 *(J.E. No.4)*.  The Company claims the

penalty of termination is authorized by the LCA for any violation of its terms.

## II.

## **ISSUE**

The issue in this case is: "Whether the Grievant violated the Last Chance Agreement and

if not, what is the remedy?"[1]

## III.

## **RELEVANT CONTRACT LANGUAGE**

---

[1] Company states the issue as follows: "Did the Grievant violate the LCA and, if not, what is the proper remedy? *(Company Brief, p. 7)*.  The Union characterizes the issue as: "Did the Employer [have] just cause to terminate the grievant and if not, what is the proper remedy. *(Union Post Hearing Brief, p.2)*.

## ARTICLE 25 – GRIEVANCE PROCEDURE

As used in this Agreement, the term "grievance" shall mean any misunderstanding, difference, or dispute between the Company and the Union, or one or more of the employees represented by the Union arising out of this Agreement, or any supplemental agreements thereto, or concerning or relating to the interpretation and application thereof and filed subsequent to the effective date of this Agreement. *(J.E. No. 1, p. 52).*

\* \* \*

## ARTICLE 26 – ARBITRATION RULES

. . . The loser of an arbitration case shall pay the cost of the Arbitrator's services and expenses, but if it is a split decision the Arbitrator shall make, as a part of his decision, a ruling as to how the cost of his services and expenses shall be prorated. . . . In deciding the case, it shall be the function of the Arbitrator to interpret the Agreement and all Supplemental Agreements thereto and to decide whether or not there has been a violation thereof. He shall have no right to change, add to, subtract from, or modify any of the terms of this Agreement and Supplements thereto . . . In disciplinary layoff and discharge cases, the permanent Arbitrator shall have the power to adjudge the guilt or innocence of the employee involved . . . *(J.E. No. 1, p. 58-60).*

\* \* \*

## ARTICLE 45 – RULES

The Company may make reasonable shop and safety rules and the disciplinary action an employee will receive for violating such shop and safety rules, and any protest against their reasonableness or inconsistency, with the terms of this Agreement, may be treated as a Grievance. *(J.E. No. 1, p. 80).*

### IV.

### STATEMENT OF THE FACTS

The Grievant, Brandon Akerman, who is 30 years old, was employed by Dana Incorporated, also known as Dana Sealing Manufacturing, LLC, hereinafter referred to as the Company, beginning on January 21, 2013 and ending with his termination on May 22, 2018. The Grievant was employed as a Production-Team Member (gasketmaker) in the Production Department at the Company's plant at 500 Techwood Drive, North, Danville, Kentucky. *(Job*

*Description, Company Exhibit No. 1).*  This plant specializes in making multi-layer steel head gaskets and seals for diesel and gas engines. The plant has approximately 200 employees.  Dana, Inc. was founded in 1904 and is a worldwide supplier of drivetrain, sealing, transmissions, hydraulic pumps, and thermal-management technologies.  The Company's headquarters is in Maumee, Ohio.  The Company's headquarters is in Maumee, Ohio.  Dana, Inc. employs 36,000 people in 33 countries on six continents.  Dana, Inc. generated sales of 8.1 Billion Dollars in 2018.  https://www.amnews.com/2017/07/27/dana-incorporated -wins-pace-award/.

The Company terminated the Grievant on May 8, 2017 for accumulating 6 attendance occurrences during the period beginning on May 13, 2016 and ending on May 5, 2017.  *(Notice of Corrective Action, dated May 8, 2017) (Union Exhibit No. 1).*  Subsequently, the Company, Grievant, and the Union executed a last chance agreement on November 1, 2017:

> Dana Incorporated has agreed to set forth the conditions for your continued employment. Your employment is subject to the following conditions:
>
> 1.  You are expected to adhere to the general plant safety rules and general rules of conduct as well as the attendance policy.
>
> 2.  Your seniority will be reinstated but you will not receive back-pay for the time that you were not working.  You will be eligible for Union Time, as stated in the CBA.
>
> 3.  Your attendance will be at the same level that it was at when you were terminated, specifically 5 occurrences.  The time that you have been off (twenty-five (25) weeks and four (4) days) will be added to the amount of time it would take for your occurrences to fall off. Specifically:

| Occurrence Date | Amount | Fall-off Date |
|---|---|---|
| 5/13/2016 | One Occurrence | 11/8/2017 |
| 7/18/2016 | One Occurrence | 1/13/2018 |
| 8/23/2016 | Half Occurrence | 2/18/2018 |
| 10/13/2016 | One Occurrence | 4/10/2018 |
| 11/16/2016 | Half Occurrence | 5/14/2018 |
| 3/3/2017 | One Occurrence | 8/29/2018 |

> 4.  There will not be another Last Chance Agreement extended to you in the future.
>
> 5.  In the event that you violate the terms of this last chance agreement your employment is

4

terminated, you will not have access to the grievance procedure unless there is a question regarding the legitimacy of the termination.

Full compliance with the requirements of this agreement constitutes your conditions of continued employment. Failure to comply with all of the terms and conditions will result in discharge. *(J.E. No. 4)*.

Mr. Jamie Snow, Production Supervisor, testified that Grievant's metal stamping press was down and not functioning for two hours at the end of the shift on May 21, 2018. Grievant worked the third shift from 10: 45 P.M. to 7:00 A.M. The machine's conveyor had jammed due to the shaker tray having locked up. Mr. Snow directed the Grievant to clean up his work area while his machine was down. Grievant's work area was covered with oil, slugs and debris. This presented a slip and fall hazard. Ms. Tina Davis, Group Leader informed him at the end of the shift that Grievant had not cleaned his work area. Mr. Snow and Ms. Davis went to Grievant's work area at the end of the shift. They confirmed that Grievant had not cleaned his work area. Grievant had not completed his "5S" (daily maintenance standard). Grievant had not completely updated his "hour by hour board." This board provides the next shift with information concerning what was done on the Grievant's shift. It includes down time, parts run and issues during the shift. Mr. Snow took photographs of the work area and the area board. *(Company Exhibit Nos. 3, 6 and 7)*. These photographs showed that Grievant's work area had not been completely cleaned and the area board had not been completely updated.

Mr. Snow testified that he met with the Grievant on May 22, 2018 concerning this incident. The meeting was also attended by Ms. Tina Davis and Mr. Butch Gyde, Union Steward. Mr. Snow told the Grievant that he was presenting him with two "write ups." These "write ups" consisted of two "written warnings." The first "written warning," dated May 21, 2018 concerned Grievant's failure to clean up his work area, failure to perform his "5S" and failure to update his "hour by hour board." The second "written warning," dated May 22, 2018

concerned unexcused absences (3 occurrences) under the Company's attendance policy. *(Notices of Corrective Action, J.E. No. 3).*

Grievant responded that he had cleaned up his work area. Mr. Snow contradicted his explanation. Mr. Snow told him that he had pictures which showed that Grievant had not carried out his instructions. Grievant explained that the preceding shift had not cleaned up the work area. Grievant said he was not going to clean up the mess left by other shifts. Mr. Snow told Grievant that he could not control the other shifts. Grievant stated he was not anyone's "fucking mom." Mr. Snow responded likewise without saying those exact words.

Mr. Snow told the Grievant that he did not fill out his area board. Grievant stated that he filled it out half-way. This was more than what the last shift did. Mr. Snow told the Grievant that he was not concerned what the other shifts did. Grievant said: "this is fucking bullshit and I guess it is my week to be picked on." Grievant asked if anyone else was going to get into trouble. Mr. Snow told the Grievant that he was the only one who failed to follow his directions. Mr. Snow asked the Grievant not to be discourteous. Grievant responded: "go on with that bullshit." Grievant kept getting louder. Mr. Snow directed him to turn in his identify badge and leave the plant. Grievant was directed to call the Human Resources office the next morning. Grievant left without his copies of the "written warnings." *(Testimony of Jamie Snow) (Company Exhibit Nos. 3 and 4).*

Ms. Tina Davis testified that she relayed Mr. Snow's instructions to clean up the work area to the Grievant on May 21, 2018. Mr. Snow wanted the Grievant to clean oil from the press and clean up the slugs from the floor. Ms. Davis came back to the Grievant's work area one hour later. Grievant had not carried out Mr. Snow's instructions. Grievant was told that he would have a "write up" if he did not comply. Mr. Snow took pictures of the press and the work

area.  Ms. Davis was present at the meeting with Mr. Snow and the Grievant on May 22, 2018.

Grievant told Mr. Snow that he was not anyone's "fucking mom."  Grievant was not going to

clean up after other shifts.  Mr. Snow told the Grievant that his area board was only half-way

filled out.  Grievant disagreed. *(Testimony of Tina Davis) (Company Exhibit No. 5).*

Ms. Katrina Wainscott testified that she has been the Company's Human Resources

Manager for over two years.  Her duties include labor relations, benefits, employee engagement,

recruiting and separations.  Under labor relations, she is involved in the enforcement of the labor

agreement and in processing grievances.  She has experience in working with last chance

agreements.  She advised the Grievant's department head that he was working under a last

chance agreement.  She did not advise the Grievant's supervisor that he was under a LCA.  This

was done to give the Grievant a fresh start.  Grievant was terminated in May 2017 for attendance

violations.  The Union grieved this termination.  The grievance was settled at the Step 3 level of

the grievance procedure by a last chance agreement.[2]

Ms. Wainscott met with the Union President, Mr. Ron Holetzky, Ms. Sandy Grubbs,

Union Steward and the Grievant on November 1, 2017.  Ms. Wainscott read the LCA to these

individuals out loud at the meeting.  She asked them if there were any questions.  There were no

questions.  She signed the LCA along with the other individuals at the meeting. Ms. Wainscott

identified the last chance agreement *(J.E. No. 4)* during her testimony. The LCA contained

paragraph one which read: "You are expected to adhere to the general plant safety rules and

general rules of conduct as well as the attendance policy."  No one at the meeting objected to

---

[2] Ms. Amy Monkowski for the Company and Mr. Mike Abell for the Union settled this grievance at the third step.
As a result, Ms. Monkowski forwarded the last chance agreement to Ms. Wainscott. Ms. Monkowsi sent an email
message to Mr. Abell on October 27, 2017 in regard to the settlement: "We will return Brandon to work under the
terms of a last chance agreement: a. Reinstate his seniority, b. No back pay, c. His attendance is at the same level
that he was at when he left and d. The time that he has been off will be added to the amount of time it would take for
his occurrences to fall off so his last occurrence will not fall off for twelve months plus the time between his term
date and return to work." *(Union Exhibit No. 1).*  On cross-examination, Ms. Wainscott testified that she had never
seen this email message before.

paragraph one.   Thereafter, the Union did not file a grievance concerning the last chance agreement until the Grievant was terminated.

Ms. Wainscott received an email, dated May 23, 2018 from Mr. Snow *(Company Exhibit No.3)* and a written statement from him, dated May 22, 2018 *(Company Exhibit No. 4)* describing his attempt to provide the Grievant with the two "write ups" (Notifications of Corrective Action).   She also received an email, dated May 23, 2018 from Ms. Tina Davis *(Company Exhibit No. 5)* describing the same May 22, 2018 meeting between the Grievant and Mr. Snow.  Ms. Wainscott reviewed these statements and the Grievant's last chance agreement. She concluded that Grievant had violated the "General Plant Safety Rules and General Rules of Conduct."  She emailed the Union President, Mr. Holetzky and requested a meeting on May 23, 2018.  She subsequently met with Mr. Holetzky, Mr. Shawn Davis, Union Vice President and Mr. Clint Kelley, HR Generalist sometime after 1:00 P.M. on May 23, 2018.  She explained to these individuals that Grievant had violated his LCA based on the May 21, 2018 incident. Therefore, she was going to terminate his employment.  Grievant was terminated effective May 22, 2018.  Grievant's last day at work began at 11:00 P.M. on May 22, 2018.  Grievant did not complete his shift which would have ended at 7:00 A.M. on May 23, 2018.  Ms. Davis's email message was sent at 3:49 A.M. on May 23, 2018 and states that Grievant was sent home.

Grievant's obligations to clean his work area, to perform "5S (daily maintenance standard)" and to update his "hour by hour board" are stated in the Grievant's job description *(Company Exhibit No. 1)* and in the "General Plant Rules and General Rules of Conduct." *(J.E. No. 5)*.  Ms. Wainscott identified Grievant's job description *(Company Exhibit No. 1)*.  The job description contains the following bullet points: "Maintains a neat and organized work area" and "Maintains the work area and equipment in a clean and orderly condition and follows prescribed

safety processes." Ms. Wainscott testified that the "General Plant Safety Rules and General Rules of Conduct"*(J.E. No. 5)* are introduced at the new employee orientation. These rules are reviewed by each employee on an annual basis. If there is a need, the rules are reviewed at shift start up meetings. The rules are posted in the employee break rooms and throughout the plant. Grievant signed a written acknowledgment that he read the rules on March 11, 2013. This acknowledgment states that a violation of these rules may result in a verbal warning, a written warning, suspension or termination. *(Company Exhibit No. 2)*. This arbitrator notes the "General Plant Safety Rules and General Rules of Conduct" *(J.E. No. 5)* are dated April 12, 2017. Therefore, the acknowledgement, dated March 11, 2013 *(Company Exhibit No. 2)* does not acknowledge the rules upon which he was accused of being in violation.

Ms. Wainscott telephoned the Grievant at home after 1:00 P.M. on May 23, 2018. Ms. Wainscott told him his termination was based on his violation of the LCA. A union representative, Ms. Sandy Grubbs was present when the telephone call was made. Grievant stated that he had no questions.

Ms. Wainscott testified that Grievant violated various bullet points on May 21, 2018 in the "General Plant Rules and General Rules of Conduct." *(J.E. No. 5)*. Under General Plant Safety Rules, Grievant violated "Keep your locker, work area, and desk clean at all times" and "All water, oil, chemicals, or grease on the floor must be removed and disposed of immediately while following proper procedures." Under General Rules of Conduct, Grievant violated the following bullet points: "3. Being insubordinate or disobedient," "7. Wasting time such as visiting, loitering, loafing, lounging, or sleeping during scheduled working hours, or leaving the work area without your supervisor's knowledge." "9. Littering or being involved in poor

housekeeping practices," and "16. Failing to properly complete all required reports." The latter bullet point referred to Grievant's failure to update his hour by hour board.

The Union grieved the termination on June 4, 2018 (Grievance No. A06042018-1). The Union argued that giving Grievant a "written warning" and then terminating him under the LCA for the same conduct was "double jeopardy." The Company denied the grievance on December 5, 2018. The Union appealed the grievance further to the Company Headquarters in Maumee, Ohio on December 7, 2018. This appeal was rejected on February 4, 2019. *(J.E. No. 2)*.

On cross-examination, Ms. Wainscott testified that she did not prepare the last chance agreement. Instead, she received the LCA from Ms. Monkowski who was in the Company office in St. Clair, Michigan. Ms. Wainscott testified that she had made the decision to terminate the Grievant based on the evidence presented by Mr. Snow and Ms. Davis. *(Company Exhibit Nos. 3, 4 and 5)*; the "General Plant Safety Rules and General Rules of Evidence," *(J.E. No. 5)* and the LCA. Although Grievant had been told by Mr. Snow to call HR the next day, Ms. Wainscott decided to contact him herself. Grievant's failure to call the HR office played no part in Ms. Wainscott's decision to terminate him. Ms. Wainscott testified the "Notice of Corrective Action, dated May 21, 2018 *(J.E. No. 3)* concerning the incident when Grievant failed to clean up his work area, failed to perform his "5S" and update his "hour by hour board" did not contain any references to or explanation of the "General Plant Safety Rules and General Rules of Conduct" which were violated. Ms. Wainscott also testified that she did not ask the Grievant about "his side of the story" during her telephone call.

On re-direct examination, Ms. Wainscott testified that Grievant did not offer any explanation during her telephone call with him. Further, Mr. Holetzky, Union President, Mr. Davis, Union Vice President and Ms. Grubbs, Union Steward, did not offer any defenses on

behalf of the Grievant. Ms. Wainscott testified that it is the Company practice not to cite each Company rule that has been violated in a Notice of Corrective Action. Instead, the notice describes the actual events that occurred. In her opinion, the Grievant should have understood that his failure to follow his supervisor's direction to clean his work area, his failure to perform "5S" and his failure to update his "hour by hour board" were violations of Company rules without having citations of each Company rule. Ms. Wainscott was asked about the email message to Mr. Abell from Ms. Monkowski, dated October 27, 2018 *(Union Exhibit No. 1)* which contained four (4) terms to be incorporated in the future LCA. Ms. Wainscott testified that the email message in no way indicates that no other terms could be added to the LCA including failure to follow Company rules.

On recross-examination, Ms. Wainscott stated that some supervisors do cite rule numbers and others do not. The Union introduced a "Notice of Corrective Action," dated July 22, 2016 for Ms. Virginia Miller who was being terminated for violating Rule Nos. 3, 7 and 19 of the General Rules of Conduct. A second letter of termination was introduced dated October 29, 2018 for Mr. Joseph Key showing a violation of Rule 19 of the General Rules of Conduct. Finally, a "Notice of Corrective Action," dated April 4, 2018 for Mr. Joseph Key was introduced showing a five day suspension for violating Rule Nos. 13 and 23 of the General Rules of Conduct. *(Union Exhibit No. 2)*. Ms. Wainscott was asked about the lack of a time limitation in the LCA itself. Ms. Wainscott testified that the parties construe that last chance agreements are in effect for one year. *(Testimony of Katrina Wainscott)*.

Grievant does not know why he was terminated in reference to the events of May 21, 2018. *(J.E. No. 3)*. Grievant ended his last day at work at 5:30 A.M. on May 22, 2018. He left his shift one and one-half hours early. Grievant testified that Ms. Wainscott called him at 2:30

P.M. on May 22, 2018 to inform him of his termination. Ms. Wainscott said he had broken his last chance agreement. Ms. Sandy Grubbs, Union Steward was also on the phone. Grievant had just woke up. He was blindsided at the news of his termination. Ms. Wainscott never referred to the Written Warning, dated May 21, 2018 *(J.E. No. 3)*. She never asked him about the allegations against him. She never gave him a chance to tell "his side of the story."

Grievant's metal press broke down about half-way during his shift on May 21, 2018. The press' "shaker tray" broke. Grievant informed his team leader and the maintenance department was called. On the following night, he came back from the break room and had a meeting with his supervisor, Mr. Jamie Snow. Mr. Snow gave him two disciplinary "write ups." One on attendance and the other on performance. Mr. Snow did not question him about these "write ups." Grievant did get a "little upset." Grievant disagrees with some of Mr. Snow's narrative in the email to Ms. Wainscott. *(Company Exhibit No. 3)*. Grievant admits saying "I am nobody's mother." He did not say "I am nobody's fucking mother."

Grievant testified that he had gotten sidetracked and did not completely fill out his "hour by hour board." Grievant admitted telling Mr. Snow the other shifts do not complete their board. Grievant further denied saying "bullshit" and "fucking bullshit." Grievant admitted saying "shit." Grievant had never received any prior "written warnings" for performance. He did get a prior "written warning" for being on a cell phone. Grievant testified that the "written warning" for the three attendance occurrences was unjustified under the contract.

On cross-examination, Grievant said he did clean his work area. Grievant testified that he was now working as an automobile technician for Goodyear. Grievant is making $15.00 per hour. Grievant has not sought manufacturing positions since his termination. Grievant wants to spend more time with his daughter. Grievant does not like working the third shift. Grievant

reviewed the LCA and was represented by Mr. Holetzky and Ms. Grubbs. Grievant does not remember if the LCA was explained to him. Grievant was unsure of the time limit in the LCA.

Mr. Ron Holetzky is the local union president. He is in his second term. He previously served three year term. Mr. Holetzky testified that he had no prior experience in working with last chance agreements. He reviewed the LCA with the Grievant before it was signed. Mr. Holetzky believes the email message from Ms. Monkowski set out the terms of the LCA. This email message did not contain the language of paragraph 1 of the LCA which referred to "the general plant safety rules and general rules of conduct." This language was not a part of the settlement. The "Written Warning" (Notice of Corrective Action), dated May 21, 2018 *(J.E. No. 3)* was not marked in the termination block. In other words, Grievant was not notified that he was being terminated. On cross-examination, Mr. Holetzky agreed that he had screwed up in signing the last chance agreement. Mr. Holetzky testified that it is normal for the union to make agreements with management through the exchange of email.

## V.

## POSITION OF THE PARTIES

**Company's Position:**

Grievant had to follow the terms of his last chance agreement. He did not. Grievant breached the Company's "General Plant Safety Rules" and "General Rules of Conduct" by refusing his supervisor's directive to clean the oil, slugs, and debris covering the floor and mat of his work area, and when he failed to complete his "5S" (daily maintenance standard) and "hour-by-hour job board." The Union concedes that Grievant disobeyed his supervisor by failing to clean his workstation. These requirements were not new to Grievant. These are breaches of the Company's rules which require Grievant's termination under the LCA.

The Union alleges two defenses in this case: (1) last chance agreement includes terms which were not agreed to by the parties and (2) Grievant was subjected to double jeopardy. Grievant's LCA contained all the terms which were agreed to by the parties. Ms. Wainscott testified that she read the LCA to the Grievant and Mr. Holetzky. Mr. Holetzky had authority to bind the Union. Grievant was not coerced into signing the LCA. Both Mr. Holezky and the Grievant had the opportunity to ask questions. Neither the Union nor the Grievant proposed any changes. *(Company Brief, p. 2).*

Public policy dictates the enforcement of a LCA as it is written. "If these last chance agreements are ignored or freely overturned by arbitrators, the parties will be discouraged from making such efforts. This would be a considerable disservice and injustice to the parties, including employees, who might benefit from "last chance opportunities."" ***Inland Container Corporation***, 91 LA 544, 549 (Howell, 1988).

A last chance agreement defines what "just cause" is. The typical elements of "just cause" are removed or reduced in a last chance agreement. The arbitrator cannot exercise his customary authority to mitigate a penalty of termination because the parties have agreed on the penalty. ***Hugo Bosca Company, Inc.***, 109 LA 533, 537-538 and ***Genie Company***, 97 LA 542, 545 (Dworkin, 1991) *(Company Brief, p. 7).*

During Mr. Holezky's testimony, Mr. Abell, Union Representative, stated the LCA did not reflect the terms agreed to by the parties. Mr. Abell's statement at the hearing is "impermissible hearsay." The Union challenges the addition of "You are expected to adhere to the general plant safety rules and general rules of conduct as well as the attendance policy." *(J.E. No. 4).* The email message, dated October 27, 2017, from Ms. Monkowski to Mr. Abell does not contain this language. However, this email message does not purport to contain all the

terms of the LCA. The LCA is neither vague nor ambiguous. Therefore, the "parol evidence rule" prohibits the arbitrator from relying on Mr. Abell's hearsay statement nor can the email message be interpreted as having modified the LCA. The Union claims the Company failed to give the Grievant proper notice of the rules he violated. Instead, the Company provided the details of the Grievant's misconduct. This is sufficient. *AK Steel Corporation*, 139 LA 96, 101 (Obee, 2018).

Double jeopardy does not apply to a last chance agreement. First, the employer can issue a penalty less than termination. Second, the employer can issue the penalty of termination under a last chance agreement for the same conduct. Double jeopardy is a "mitigating factor" which cannot be considered by the arbitrator when construing the effect of a last chance agreement. *Gladfelter*, 126 LA 1774, 1779 (Allen, 2009). The issuance of lesser discipline does not invalidate more severe discipline given under a last chance agreement. *Central Ohio Transit Auth.*, 113 LA 1134, 1142 (Imundo, 2000). *(Company Brief, p. 3, 12).* The Arbitrator must uphold Grievant's termination.

**Union's Position:**

Grievant was issued a written warning despite there being no penalty in the attendance policy for three occurrences. This wipes out the written warning for attendance, dated May 22, 2018. The Company admitted these attendance violations had no bearing on its decision to terminate. *(Union Post Hearing Brief, p. 3-4).*

The Union never agreed to base Grievant's continued employment under paragraph one of the LCA which states: "You are expected to adhere to the general plant safety rules and general rules of conduct as well as the attendance policy." *(J.E. No. 4).* The addition of this paragraph was missed when the Union reviewed the LCA. "The Employer took advantage of the

Union's inexperience" in this matter.  Grievant was previously terminated in 2017 for an alleged violation of the attendance policy. Grievant was returned to work by the LCA through the grievance procedure.  The parties agreed that any future violation of the LCA should be based only on a violation of the attendance policy. *(Union Post Hearing Brief, p. 3-4)*.

Grievant was subjected to double jeopardy when he received written warnings for attendance and performance reasons and then terminated under the last chance agreement. Fundamental concepts of justice and fairness require that once an employee has been disciplined for misconduct, the employee will not again be subject to discipline for the same offense. *Meijer*, 120 LA 700, 706 (Obee, 2004); St. *Lucie County*, 115 LA 1046, 1048-49 (Frost, 2001); *Metropolitan Tulsa Transit Authority*, 112 LA 146, 151-52 (Jennings, 1999) and *United International Investigative Service*, 114 LA 620, 626 (Maxwell, 2000).  Double jeopardy concepts also preclude increasing the penalty for a violation after discipline has been imposed. *Hydro Aluminum*, 119 LA 449, 455 (Cloke, 2004). *(Union Post Hearing Brief, p. 4-6)*.

The termination was issued on May 22, 2018 for his alleged actions on May 21, 2018. The statements, dated May 23, 2018 given by supervisors, Jamie Snow *(Company Exhibit No. 3)* and Tina Davis *(Company Exhibit No. 5)* should not be given any weight.  These statements were given on the day after the termination and had no impact on the Company's decision to terminate.  *(Union Post Hearing Brief, p. 2)*.

Grievant was denied due process. There was no investigation.  One of the indispensable "industrial due process rights" is the right of an employee who is accused of misconduct to answer the charges before the company makes the final decision. Grievant was never given the opportunity to offer any denials, explanations or justifications which may have been relevant. In

16

*Lockheed Corp.*, 83 LA 1018, 1023 (Taylor, 1984), the arbitrator stated: Management did not give the employee a chance "to tell his side of the story" before the discharge decision was made.

The Company never questioned the Grievant about "his side of the story" before making the termination decision. Ms. Katrina Wainscott testified the decision had been made prior to her telephone call informing Grievant of his termination. An employee's discharge for pulling a knife on a coworker was set aside when the employee had never been interviewed. Fairness dictated that the employee be given the opportunity to tell his side of the story. *CR/PL Limited Partnership*, 107 LA 1084, 1087 (Fullmer, 1996).

In *McCartney's Inc.*, 84 LA 799, 804 (Nelson, 1985), the arbitrator refused to sustain the employee's discharge: "A just cause proviso, standing alone, demands that certain minimal essentials of due process be observed. One at least of those minimum essentials is that the accused have an opportunity, before sentence is carried out, to be heard in his own defense." *(Union Post Hearing Brief, p. 7-8)*.

The grievance should be sustained. Grievant should be returned to work with all lost wages, including interest, seniority and benefits.

## VI.

## OPINION AND ANALYSIS

### A.

### *LAST CHANCE AGREEMENT*

A "Last Chance Agreement" has been defined as: "a negotiated written agreement between the individual employee, the Union, and the Employer which essentially modifies the terms of the collective bargaining agreement for a limited period for the purpose of rehabilitating that employee whose conduct would have otherwise warranted discharge. As such, it is an

17

agreement outside of the collective bargaining agreement that is ***strictly construed and enforced***. It can be viewed as a modification of the master collective bargaining agreement in their application to special employees, where the Employer gives valuable consideration by giving up a contended right to discharge an employee and the employee in exchange forfeits for that limited period negotiated rights . . . in order to demonstrate to the Employer that he or she merits retention rather than discharge. . . . ***A Last Chance Agreement is, in essence, the parties' agreement defining what is just cause in respect to the Grievant during the specified time period.*** ***Ingersoll-Dresser Pump Company***, 114 LA 297, 301 (Bickner, 1999) (emphasis added). *See also* Elkouri & Elkouri, HOW ARBITRATION WORKS, 15-52 (Kenneth May, et al., 8th ed., Bloomberg BNA, 2016). The employee's protections under "just cause" are not normally removed by the last chance agreement. ***Hugo Bosca***, 109 LA 533, 537-538 (Franckiewicz, 1997).

The validity of a "last chance agreement" can be evaluated on the basis of the following five factors: (1) Was the Grievant afforded Union representation prior to signing the LCA? (2) Were the requirements outlined in the LCA reasonable? (3) Did the Grievant sign the LCA of his own free will? (4) Did the Grievant understand the provisions of the LCA? (5) Was the probationary period of a reasonable duration? ***Gaylord Container Corporation***, 97 LA 382, 383 (Goodman, 1991). The arbitrator finds the answer of "yes" to factors one thru three. Grievant disputes factor four. However, the evidence persuades the arbitrator that he knew the provisions of the LCA, or at least was given the opportunity to review the LCA with his union representative before its execution. The answer to factor four is yes. The answer to factor five is a "conditional no." Yet, the validity of the LCA still stands. The LCA had no time limitation. There was only a little more than six months from the date of the LCA until the Grievant's

discharge. This duration of time is reasonable.[3] Consequently, this arbitrator finds the last

chance agreement, dated November 1, 2017 *(J.E. No. 4)* to be valid.

The majority of arbitrators limit their review of a discharge under an LCA to its terms.

These arbitrators subscribe to the proposition that an LCA can waive or modify an employee's

rights under a CBA. The employee may lose the right to have a grievance reviewed for just

cause or to have it reviewed at all. The arbitrator's ability to review the disciplinary action is

limited by two threshold considerations: (1) whether the last-chance agreement was valid, and

(2) whether the terms of the agreement were violated. ***Rocktenn Services, Inc.***, 10-2 ARB

¶5129 (Holley, 2009).

The Union states the Company added the following clause to the LCA: "You are

expected to adhere to the general plant safety rules and general rules of conduct as well as the

attendance policy." *(J.E. No. 4)*. The Union argues: "This verbiage was not agreed upon by the

Union and was missed when reviewing the LCA prior to [Grievant] signing and returning to

work. When this fact was discussed with the Employer at the grievance meeting the Employer

took the position of gotcha and refused to omit it." *(Union Post Hearing Brief, p. 6)*. The

Company argued: "the LCA is neither vague nor ambiguous and all involved understood its

terms. It is the entire agreement. ***The parol evidence rule prohibits the review of any outside***

---

[3] Arbitrators are reluctant to enforce "perpetual" last chance agreements. Most last chance agreements are written with time limitations (e.g. six months, one year, two years, three years, etc.). It is not uncommon for an arbitrator to supply a "reasonable" expiration date when none is recited. ***Genie Company***, 97 LA 542, 545 (Dworkin, 1991). The lack of a time limit in the last chance agreement is not necessarily a basis for setting it aside. In this situation, the arbitrator must decide what amount of time is reasonable for the life of the last chance agreement. ***Ohio Department of Highway Safety***, 96 LA 71, 77 (Dworkin, 1990). An arbitrator held an LCA invalid where the employer discharged the employee six years after its execution. This was considered an unreasonable amount of time. ***Parker Hannifin Corporation***, 1997 LA Supp. 103128, 98-1 ARB ¶5076 (Morgan, 1997). Grievant was terminated on May 22, 2018. Grievant's LCA was dated November 1, 2017. The LCA was in effect for six months and three weeks. This time limit is reasonable. Ms. Wainscott testified the parties consider a one year time limit for last chance agreements to be reasonable under the circumstances. ***Grievant testified that he did not know what time limit applied to his last chance agreement.***

*documents (i.e. prior emails) to interpret or modify the LCA.*"  *(Company Brief, p. 10)*
(emphasis added).

The "parol evidence rule" holds that oral statements are not normally admissible to
modify, vary, explain or contradict the plain terms of a valid written agreement.  ***Boogaart
Supply Company, Inc.***, 85-1 ARB ¶8068 at 3282 (Fogelberg, 1984).  The parol evidence rule
applies to exclude not merely oral utterances, but also informal writings other than the single and
final written agreement.  ***Klopfenstein's***, 75 LA 1224, 1226 (Lumbley, 1980).   Courts have
stated innumerable times that spoken or parol evidence will not be received to add to, take from,
or change a written contract unless the written form exists as the result of mutual mistake or
fraud.  ***Terre Haute Water Works Corp.***, 5 LA 747, 749 (Updegraff, 1946).  Under the parol
evidence rule, the written agreement is deemed to constitute the entire agreement. If the writing
is clear and unambiguous, parol evidence will not be allowed to vary the written agreement.
***Monroe County, Highway Department***, 70-2 ARB ¶8584 at 4918 (Rice, 1970).  *See also*
Elkouri & Elkouri, HOW ARBITRATION WORKS, 8-38 (Kenneth May, et al., 8th ed., Bloomberg
BNA, 2016).

The last chance agreement in this case is clear and unambiguous.  There is no evidence
the Grievant was coerced to sign this LCA against his will.  The Union has not argued the LCA
resulted from mutual mistake or fraud between the parties.  The Union argues the email message,
dated October 27, 2017 from Amy Monkowski to Mike Abell, sets out all the provisions which
were agreed to by the parties.[4] *(Union Exhibit No. 1, p. 2) (Union Post Hearing Brief, p. 3).*  This

---

[4] The email message provides: " 2) We will return [Grievant] to work under the terms  of a last chance agreement:
a. Reinstate his seniority, b. No back pay, c. His attendance is at the same level that he was at when he left and d.
The time that he has been off will be added to the amount of time it would take for his occurrences to fall off so his
last occurrence will not fall off for twelve months plus the time between his term date and return to work." *(Union
Exhibit No.1, p. 2).*

arbitrator must reject the Union's argument concerning this email being evidence of the parties' entire agreement based on the parol evidence rule.

An arbitrator must examine whether the employee's alleged misconduct is covered by the last chance agreement. If the LCA prohibits certain violations, the employer may discharge the employee for this type of misconduct. The arbitrator is limited to determining whether or not the employee committed this type of misconduct. If so, the arbitrator cannot consider the proportionality of the penalty and set aside the discharge. Some arbitrators will not consider the evenhandedness of the penalty. They will not consider whether the penalty of discharge is in keeping with the penalties given to other similarly situated employees. Last Chance Agreements dispense with the usual requirements of progressive discipline and permit the employer to discharge an employee for even minor misconduct. Further, the arbitrator cannot consider matters in mitigation of the penalty. *Eaton Cutler-Hammer Corporation*, 110 LA 467, 471 (Franckiewicz, 1998) and *Kaydon Corporation*, 89 LA 377, 379 (Daniel, 1987).

An employee who signs a last chance agreement only gives up the rights him or her expressly agrees to give up. *Hendrickson Turner Company*, 101 LA 919, 922-923 (Dworkin, 1993). *See also Kraft Foods Global, Inc.*, 2005 Lab. Arb. LEXIS 482 (Day, 2005).

> An arbitrator must abide by the terms of a last-chance agreement fairly negotiated between an employer, an employee, and (where applicable) the union representing the employee." "Depending on its wording, the agreement may or may not replace the just cause requirement. *Because the just cause requirement is so fundamental, an arbitrator should not, without express language, presume the parties intended to abandon it.* THE COMMON LAW OF THE WORKPLACE, 173-175 (Theodore J. St. Antoine ed., Bureau of National Affairs, 2005). (emphasis added).[5]

The last chance agreement in this case *(J.E. No. 4)* does not exclude the principle of "just cause." The "Collective Agreement," *(J.E. No. 1)* does not contain a specific "just cause"

---

[5] Where the LCA does not specifically exclude "just cause," some arbitrators hold the employee does retain some rights under "just cause." In *Lenzing Fibers Corporation*, 105 LA 423, 429 (Sergent, 1995).

provision.  However, "Just Cause"[6] is so universally observed in both private and public sector

employment that it has become traditional for arbitrators to infer its existence even where the

precise words are not in a contract." *Genie Company*, 97 LA 542, 548 (Dworkin, 1991).  This

arbitrator has inferred the principle of "just cause" in this case.

I find the Company has proved by the preponderance of the evidence that Grievant did

not follow the directions of his supervisor, Mr. Jamie Snow, on May 21, 2018, when he failed to

clean his work area; failed to perform his "5S" (daily maintenance standard) and failed to update

his "hour by hour board." *(J.E. No. 3)*.[7]  I find this was a violation of the last chance agreement,

dated November 1, 2017. *(J.E. No. 4)*.

## B.

### DUE PROCESS AND THE MEANINGFUL OPPORTUNITY TO RESPOND

A "meaningful opportunity to respond to the charges" is a due process right which

normally is not abrogated by a last chance agreement. *Kellogg Company*, 08-2 ARB ¶4408

(Smith, 2008).  An employee who has been accused of violating an employer's policy is entitled

---

[6] Arbitrator Carroll Daugherty created seven tests for just cause in *Grief Bros. Cooperage Corporation*, 42 LA 555, 557-558 (Daugherty, 1964) based on the opinions of other arbitrators which has created a common law definition of just cause.  Daugherty states a "no" answer to any one or more of the seven tests means that the employer's disciplinary decision is not based on just cause.  I have summarized these seven tests in my own words as follows: (1) Was there forewarning of the consequences of the employee's conduct? (2) Was the employer's rule reasonable? (3) Did the employer, prior to imposing discipline, investigate the employee's misconduct and provide the employee with the details of the investigation so that he or she can have a meaningful opportunity to respond? (4) Was the employer's investigation conducted fairly and objectively? (5) Did the employer obtain substantial evidence that the employee was guilty? (6) Did the employer apply its rules, orders and penalties evenhandedly without discrimination? (7) Was the discipline reasonably related to the seriousness of the employee's offense?  In this case, where the Grievant was discharged under a last chance agreement, this arbitrator can say "yes" for tests one thru five.  The arbitrator is not required to answer tests 6 and 7 because the LCA provides a penalty of discharge. Therefore, the arbitrator is prohibited from setting the penalty aside because of "disparate treatment" and cannot mitigate the penalty based on proportionality.  Note: Due process is also a part of "just cause."  The opportunity to respond in test three is required by "due process."  The union argues that the discharge should be set aside because the Grievant was subjected to "double jeopardy."  Double jeopardy is a part of "due process."  It is not a part of Daugherty's analysis.

[7] Grievant violated the following General Plant Safety Rules: "Keep your locker, work area, and desk clean at all times."  Grievant further violated the following General Rules of Conduct: "3. Being insubordinate or disobedient. 9. Littering or being involved in poor housekeeping practices.  16.  Failing to keep all required reports.  23. Use of disruptive, abusive, and/or verbally offensive behavior to fellow Team members, customers, and/or vendors." *J.E. No. 5)*.

to be heard before a decision is made. DISCIPLINE AND DISCHARGE IN ARBITRATION 25

(Norman Brand & Melissa H. Biren eds., Bloomberg BNA, 3rd ed. 2015). "Procedural

Safeguards for employees subjected to discipline have become an institutional feature of the

labor arbitration process. Those protections include the right to a ***meaningful opportunity*** prior

to imposition of a penalty to respond to the allegations. Raymond L. Hogler, *Employee*

*Discipline and Due Process Rights: Is There an Appropriate Remedy?* Lab. L.J. 783 (December

1982) (emphasis added).

     ***"The fundamental requisite of due process is the opportunity to be heard*.*"*** ***Grannis v.***

***Ordean***, 234 U.S. 385 (1914). The concept of a fair investigation includes the basic due process

right of an employee to be given notice of disciplinary charges and a ***meaningful opportunity to***

***respond*** to the charges before discipline is imposed. ***Department of The Army***, 133 LA 1476,

1498, 14-2 ARB ¶6274, 114 LRP 41211 (Kininmonth, 2014).

     In ***First Student***, 132 LA 777, 782 (Landau, 2013), a mechanic for a school bus company

was on a "last warning" after receiving numerous write ups and disciplinary actions. The

mechanics supervisor decided to discharge the grievant for failure to conduct maintenance

inspections and for falsifying preventive maintenance checklists. The supervisor decided not to

discuss the reasons for the discharge with the mechanic since he was on a "last warning." The

arbitrator found there was enough evidence to discharge the mechanic. Yet, the Arbitrator held

that the mechanic's discharge was not for "Just Cause." This was due to the fact that the

supervisor did not meet with the mechanic and explain the charges. The supervisor's failure to

meet with the mechanic prevented him from presenting any defense to the proposed discharge

including matters in mitigation. The Arbitrator stated: "the Company is required to conduct a

"fair investigation" to establish guilt of violation of Employer policy or other employment

related wrongdoing. ***The concept of fair investigation includes the basic due process rights of an employee to be given notice of disciplinary charges and a meaningful opportunity to respond to the charges before discipline is imposed.*** (emphasis added).

Many arbitrators have upheld the right of the charged employee to respond with their side of the story. "Does the failure to give the grievant an opportunity to explain, to present his side of the case, before the decision is made, so contaminate the decision as to preclude a finding that it was for just cause?  At least where, as here, there is no crisis, no emergency, no urgency, we think it does.  A just cause provision, standing alone, demands that certain minimal essentials of due process is observed.  One at least of those minimum essentials is that the accused have an opportunity, before sentence is carried out, to be heard in his own defense." ***McCartney's Inc.***, 84 LA 799, 804 (Nelson, 1985).

The Union claims that Grievant was not allowed to tell his side of the story before being terminated under the last chance agreement. *(Union Post Hearing Brief, p. 2)*.  The arbitrator finds this claim to be unsupported by the evidence.  Mr. Jamie Snow, supervisor, presented the Grievant with two written warnings. *(J.E. No. 3)*.  Grievant became belligerent and used profanity.  Mr. Snow was forced to order the Grievant to leave the premises.  Mr. Snow was not able to provide Grievant an opportunity "to tell his side of the story."  This situation was in the form of an emergency as discussed in ***McCartney's Inc.***, Id.  I find Grievant's inability "to tell his side of the story" was due to his own misconduct.  I do not find a due process violation under these circumstances.

### C.

### ***DOUBLE JEOPARDY***

The Union argues that Grievant was subjected to "double jeopardy." *(Union Post*

24

*Hearing Brief, p. 4).* The doctrine of "Double Jeopardy" is well established in arbitral law. It is universally accepted by arbitrators that an employee should not be punished twice for the same offense. ***City of Indianapolis***, 86-2 ARB ¶ 8469 (Strasshofer, 1986) at 4965.[8] Double Jeopardy arises when an employee is disciplined twice or more for the "***same act.***" The key word is the "***same act.***" ***A.J. Oster Foils, Inc.***, 10-2 ARB ¶4983 (Fullmer, 2010).

In ***Misco Precision Casting Co.***, 40 LA 87, 90 (Dworkin, 1962), the employer's personnel director approached the two grievants who were playing cards. He told the grievants "either put up your cards or go home." The grievants immediately put down their cards and returned to their work stations. A short time later, a foreman handed each grievant a "three day suspension notice." Arbitrator Dworkin found that the Personnel Director had given the grievants a "disciplinary warning" and later followed it up with a "three day suspension." In Dworkin's words, this constituted "double jeopardy." Further, "[T]he situation here presented is readily distinguishable from one in which an employee is suspended pending an investigation of the facts, and where the application of a penalty is deferred for legitimate reasons."

In ***Marmon Keystone Corp.***,115 LA 760 (Kenis, 2001), the grievant and three other employees were seen leaving the employer's premises and returning in two trucks. A meeting was held immediately between two supervisors, the grievant and the other employees. The employer had a rule against leaving company premises without supervisory permission. One of the supervisors allegedly told the grievant and the other employees that he would not turn in

---

[8] There are a few arbitrators who do not recognize the doctrine of "Double Jeopardy." In ***HBI Automotive Glass***, 97 LA 121 (Richard, 1991), the arbitrator said: "Double Jeopardy is a criminal law concept, arising under the constitution, which really has no application to industrial relations." *See also **Diamond Gardner Corp.***, 32 LA 581, 586 (Smith, 1959); Ray J. Schoonhoven, ed., FAIRWEATHER'S PRACTICE AND PROCEDURE IN LABOR ARBITRATION 417-418 (4th ed. 1999) and Karen L. Ertel, GRIEVANCE GUIDE 27 (14th ed., Bureau of National Affairs, 2017).

write ups to higher management unless there was a further incident of the same nature.  Later, write ups were turned in to higher management and the Grievant was terminated .

Arbitrator Kenis found that grievant "was subjected to double jeopardy when he was first warned and then discharged for violating the plant rule against leaving the premises without permission."  The grievant initially received a disciplinary warning which was accepted by him and his union steward without protest.  The Arbitrator found that a supervisor told grievant and the other employees that if this infraction occurred in the future, the matter would be reported to higher management.  In this case, the supervisor in question knew all the facts concerning the infraction at the time of the disciplinary warning.  No new facts or information were obtained during management's investigation of this matter which would indicate the need for harsher punishment.   Both the grievant and the supervisor thought the disciplinary warning was the final disposition of the matter.  Apparently, higher management had different thoughts and ordered grievant's termination.  The Arbitrator ordered grievant's reinstatement based on a finding of "double jeopardy."

The Arbitrator in *Transit Authority of River City*, 118 LA 939 (Goggin, 2003) also found "double jeopardy" and reinstated a grievant after his discharge.  The grievant was discharged from his position as a bus driver.  The grievant had a prior disciplinary history of deviating from his route, arriving at bus stops too early and failing to answer his phone.  Subsequently, a supervisor caught him arriving five minutes early at one of his stops.  A supervisor gave the grievant a written notice of a "six day suspension."  Grievant continued working without interruption for several days.  Finally, he was called back to see the Director of Transportation, who discharged him.  Arbitrator Goggin stated: "the concept of "double jeopardy" clearly applies

to this case." "Once the Company assesses a penalty, the Company does not have the right, in

the absence of additional facts, to increase the severity of the penalty."

The concept of "Double Jeopardy" arises from the Fifth Amendment to the U.S.

Constitution which provides: "nor shall any person be subject for the same offense to be twice

put in jeopardy of life or limb." U.S. CONST. AMEND. V.[9] It has long been held that industrial

due process requires adherence to principles analogous to the Fifth Amendment's protection

against double jeopardy.  TIM BORNSTEIN ET. AL., 1 LABOR AND EMPLOYMENT ARBITRATION,

§ 15.07[2][a](LexisNexis, 2019).

Mr. Whitley P. McCoy, a famous pioneer in labor arbitration, discussed "double

jeopardy" in *International Harvester Co.*, 16 LA 616 (McCoy, 1951) thusly:

> When a long established principle, such as protection from double jeopardy, is
> applicable, he should apply it even though he is not a criminal court judge.  The Union
> has cited decisions by Arbitrators George Taylor and Ralph Seward applying the doctrine
> of double jeopardy, and there are decisions of other arbitrators in accord.  No decisions of
> arbitrators to the contrary have been cited.  I conclude that if Hall was punished twice for
> the same offense or offenses, the second penalty must be set aside.  ***To sustain it would
> be contrary to fundamental concepts of justice, and would diminish confidence in
> arbitration as a process for obtaining justice.*** (emphasis added).  *See also* Elkouri &
> Elkouri, HOW ARBITRATION WORKS, 15-65, 15-66, (Kenneth May, et al. eds., 8[th] ed.,
> Bureau of National Affairs, 2016) and DISCIPLINE AND  DISCHARGE IN ARBITRATION,
> 2-28, 2-29, 2-30 (Norman Brand & Melissa H. Biren eds., Bloomberg BNA, 3rd ed.,
> 2015).

If an employer initially decides to give an employee a "written warning" and informs the

employee, the vast majority of arbitrators would hold that increasing it to a discharge would

---

[9] "Double Jeopardy" is "The fact of being prosecuted or sentenced twice for substantially the same offense."
BLACK'S LAW DICTIONARY 598 (10th ed. 2014).  "If there is anything settled in the jurisprudence of England and
America, it is that no man can be twice lawfully punished for the same offence . . . there has never been any doubt
of its entire and complete protection of the party when a second punishment is proposed in the same court, on the
same facts." *Ex Parte Lange*, 85 U.S. (18 Wall.) 163, 168 (1874).

constitute "double jeopardy."[10]  This still would be true even if the decision to discharge was made the next day.  Double Jeopardy would still be found even if the disciplinary action had not been reduced to writing.  In this case, the Grievant was presented with two "written warnings," dated May 21 and 22, 2018.  *(J.E. No. 3)*.  Grievant did not sign these written warnings.  Nonetheless, the Grievant was disciplined for the incidents in question on May 21, 2018.

The situation in this case is similar to that in **The Canyons Inc.**, 123 LA 1271, 1277 (Gaba, 2007) where the grievant was told by his supervisor at a ski resort that she was going to give him a "written warning" for his insubordination and his intent not to follow sled loading protocol.  The supervisor asked the Grievant to sign a blank warning form.  The Grievant refused to sign the blank warning form.  The supervisor later changed her mind and decided that the grievant should be discharged.  The arbitrator found "Double Jeopardy" based on the fact that the supervisor intended to give the grievant a "written warning" and communicated this fact to the grievant in a face to face meeting.

The Company argues that "There is No Double Jeopardy in the Context of a Last Chance Agreement."  "The claim of 'double jeopardy' is not an issue within the authority of the

---

[10] In **Bimbo Bakeries USA**, FMCS Case No. 14-58191-7, (unpublished decision)(Kininmonth, 2014), this arbitrator found the grievant was subjected to double jeopardy.  On May 27, 2014, the grievant who drove a bread delivery truck was seen by a janitor urinating outside an elementary school.  The grievant was not visible to any other persons including students and teachers inside the school.  The grievant was interviewed by his supervisor over this incident that day.  Grievant claimed to have bladder problems.  The supervisor told the grievant and his union representative that he would receive a "written warning or write up" over this incident.  School officials complained and requested that grievant no longer make deliveries to the school.  The supervisor was overruled by Human Resources.  On May 29, 2014, the grievant was suspended pending investigation.  The supervisor had prepared a "write up."  This "write up" was never given to the grievant.  The grievant was terminated on June 10, 2014 for an "extreme offense" under a Company rule which prohibited "unsanitary actions" and for further violating the CBA by committing an "extreme offense."  The grievant's termination was based on the incident at the elementary school and on grievant's practice of urinating in a plastic bottle which was kept on the bread delivery truck in proximity to product.  This arbitrator vacated the termination because of a lack of just cause.  The grievant had been subjected to double jeopardy.  This arbitrator found that the appropriate penalty was the "write up" which was originally proposed by the supervisor.  The second offense concerning urinating in the plastic bottle and keeping the bottle on the delivery truck was stricken.  The grievant had not been notified that his termination was also based on this additional charge.  The Company's failure to notify the grievant about this additional charge denied the grievant fundamental due process inconsistent with the Just Cause standard.

Arbitrator when called upon to interpret the terms of the 'Last Chance Agreement.' This contention is another of those 'mitigating factors' that have been removed from the consideration of the Arbitrator via last chance agreement." ***Glatfelter***, 126 LA 1774, 1779, 09-2 ARB ¶4694 (Allen, 2009) *(Company Brief, p. 12)*.

This arbitrator disagrees with this quotation from the ***Glatfelter*** decision. ***Double jeopardy is not a "mitigating factor" which cannot be considered by the Arbitrator in reducing the penalty under the last chance agreement. Double jeopardy is an "affirmative defense," not a "mitigating factor." The arbitrator can consider "affirmative defenses."*** "I note that normally it is the Union's burden to show double jeopardy." ***Veolia ES Solid Waste Midwest LLC***, 131 LA 1457, 1465, 13-2 ARB ¶5887 (Goldstein, 2013). "The critical element of a ***double jeopardy defense*** is that two punishments must [not] be imposed for the same act of wrongdoing." ***Gogebic County Road Commission***, 121 LA 929, 935, 05-2 ARB ¶3273 (Poindexter, 2005) (emphasis added). Double jeopardy is proper ***defense*** in disciplinary cases." ***Department of The Air Force***, 74 LA 949, 951 (Ward, 1980) (emphasis added).

One of the major elements to be considered in the construction and bargaining of last chance agreements is: "***The employee must not be placed in double jeopardy by a second levying of discipline for [misconduct] punished and in the record***." ***GATX Terminals***, 95-1 ARB ¶5136 (Koenig, 1994) (emphasis added). Thus, the arbitrator can overturn discipline which subjects the employee to double jeopardy under a last chance agreement.

On the other hand, the arbitrator is not allowed to consider reducing the penalty set out in the last chance agreement due to "mitigating factors," "progressive discipline," "proportionality" and "evenhandedness in setting penalties commensurate with those given to other similarly situated employees/disparate treatment." ***Eaton Cutler-Hammer Corporation***, 110 LA 467, 471

(Franckiewicz, 1998) (proportionality, disparate treatment); ***Kaydon Corporation***, 89 LA 377, 379 (Daniel, 1987) (progressive discipline, mitigating factors); ***Hugo Bosca Company, Inc.***, 109 LA 533, 539 (Franckiewicz, 1997) (proportionality); ***Lenzing Fibers Corporation***, 105 LA 423, 428 (Sergent, 1995) (progressive discipline, mitigating factors) and ***Merchants Fast Motor Lines***, 99 LA 180, 183 (Marlatt, 1992) (progressive discipline).

Based on the evidence, I find the Grievant was presented with a "written warning" on May 22, 2018. The "written warning" is a form of "discipline." ***Dane County, Wisconsin***, 97 LA 221, 226 (Flaten, 1991). "Double Jeopardy" is an affirmative defense and the burden of proof thereof is on the Union in this case. Therefore, I find by the preponderance of the evidence[11] that Grievant was subjected to "Double Jeopardy" when he was terminated under the last chance agreement after being disciplined by a "written warning."[12]

Double Jeopardy is a component of industrial "due process." TIM BORNSTEIN ET. AL., 1 LABOR AND EMPLOYMENT ARBITRATION, § 15.07[2][a](LexisNexis, 2019) and Ray J. Schoonhoven, ed., FAIRWEATHER'S PRACTICE AND PROCEDURE IN LABOR ARBITRATION 417-418 (4th ed. 1999) and ***Erie County Sheriff***, 93-1 ARB ¶3059 (Ray, 1992).

---

[11] Preponderance of the Evidence. "The greater weight of the evidence, not necessarily established by the greater number of witnesses testifying to a fact but by evidence that has the most convincing force; superior evidentiary weight that, though not sufficient to free the mind wholly from all reasonable doubt, is still sufficient to incline a fair and impartial mind to one side of the issue rather than the other." BLACK'S LAW DICTIONARY 1373 (10th ed. 2014).

[12] The negotiated "Collective Agreement" *(J.E. No. 1)* does not specify the burden of proof to be used in the arbitration of discipline cases including terminations. In the private sector, most arbitrators rely on preponderance of the evidence in ordinary discipline cases. Private sector employers have the burden of proof in discipline cases because they possess the material facts upon which the discipline was based. ***National Lawyers Club, Inc.,*** 52 LA 547, 551(Seidenberg, 1969). *See also* Elkouri & Elkouri, HOW ARBITRATION WORKS, 15-25 (Kenneth May, et al. eds., 8th ed., Bloomberg BNA 2016). "Since arbitration is in the nature of a civil proceeding. We should expect to find the requirement that parties prove their claims and *affirmative defenses* by a preponderance of the evidence, regardless of their particular nature." Robert H. Gorske, *Burden of Proof in Grievance Arbitration,* 43 MARQUETTE LAW REV. 135, 162 (1959) (emphasis added). I will apply the evidentiary standard of "preponderance of the evidence" in this case.

Arbitrators take one of three alternate positions when confronted with procedural and due process irregularities: (1) That unless there is strict compliance with procedural requirements and due process, the whole action will be vacated and nullified. (2) That the procedural and/or due process requirements are significant only when the employee can show that he or she has been prejudiced by the employer's failure to comply therewith. If so, the employee's discipline may be mitigated. (3) The employer fails to comply with procedural requirements or fails to provide due process. These procedural requirements and due process provisions are important. Therefore, the employer will be penalized for noncompliance and the employee's discipline will be modified accordingly. The arbitrator will not usually declare the action null and void. Many arbitrators choose the third option. WILLIAM H. HOLLEY, JR., WILLIAM H. ROSS & ROGER S. WOLTERS, THE LABOR RELATIONS PROCESS 624 (11th ed., Cengage Learning, 2017).

In this case, this Arbitrator will apply the first option. The termination action cannot stand because it lacks "*Just Cause.*" The due process requirement of not placing the Grievant in double jeopardy is a significant right which the Company denied.[13] The arbitrator in *Crown Cork & Seal Company,* 111 LA 83 (Harris, 1998) reversed the termination of the grievant

---

[13] This arbitrator's decision to vacate the termination under the last chance agreement is not inconsistent with decisions of the U.S. Court of Appeals for the Sixth Circuit. The court has issued a number of opinions setting aside arbitrator's decisions when there is a failure to abide by the terms of the last chance agreements which modified the definition of just cause. *Integrated Metal Technology*, 121 LA 1729, 1739-1740 (Roumell, 2006). In *Bakers Union Factory, #326 v. ITT Continental Baking Company*, 740 F.2[nd] 350 (6th Cir. 1984), the court found the arbitrator had ignored the a last chance agreement between the company and the union setting conditions for an employee with alcohol addiction problems. Instead, relying on the parties' CBA, the arbitrator mitigated the employee's termination. The employee was reinstated subject to the conditions of a new probationary period. The court stated that the arbitrator was bound to follow the original LCA which provided for termination upon the employee's violation of the conditions therein. The court reaffirmed the above decision in *Ohio Edison Company v. Ohio Edison Joint Council*, 947 F.2[nd] 786 (6th Cir. 1991). The employee in that case was subject to an LCA due to substance abuse. The arbitrator found the penalty of termination to be to be "unreasonably harsh." The court found the arbitrator had no authority to set aside the termination. In this case, this arbitrator has not ignored the LCA. The LCA in this case requires the penalty of termination if the employee (the grievant) violates its terms. Although the grievant violated the terms of the LCA, this arbitrator set aside the termination of the grievant under the LCA, because the Company subjected him to "double jeopardy," a due process violation. This arbitrator did not set aside the termination in consideration of "mitigating factors," "disparate treatment," "proportionality" or "progressive discipline."

because the employer subjected him to "double jeopardy." The arbitrator, however, imposed a suspension without pay in lieu of the termination. The arbitrator made this decision because the Grievant was guilty of misconduct. The Grievant was originally suspended prior to his discharge. The Grievant in this case is also guilty of misconduct in his failure to clean his work area, failure to perform his "5S" (daily maintenance standard) and update his "hour by hour board." The Grievant has received a prior written warning for this misconduct on May 21, 2018. *(J.E., No. 3)*. This written warning must now stand in lieu of the Grievant's termination under the last chance agreement. This arbitrator cannot reinstate the Grievant by converting his discharge to a suspension without pay. Grievant was never suspended. Grievant initially received a "written warning" only.

I find by the preponderance of the evidence, that Grievant's discharge under the last chance agreement lacked "Just Cause." The Company denied the Grievant due process by subjecting him to double jeopardy. The Company must reinstate the Grievant to his former position of Production Team Member (gasketmaker) effective May 22, 2018.

## VII.

### *CONCLUSION*

1.   I find the Company proved by the preponderance of the evidence that Grievant did not comply with his supervisor, Mr. Jamie Snow's direction to clean his work area, failed to perform his "5S" (daily maintenance standard) and update his "hour by hour board" on May 21, 2018 in violation of the "Last Chance Agreement, dated November 1, 2017."
*(J.E. No. 4)*.

2.   I find the Union proved its affirmative defense of double jeopardy. The Company denied the Grievant due process by subjecting him to double jeopardy. Grievant received a

"Notice of Corrective Action, dated May 21, 2018 *(J.E. No. 3)* for failing to comply with his supervisor's direction to clean his work area, for failing to perform his "5S" (daily maintenance standard) and update his "hour by hour board." The same circumstances were used to trigger Grievant's termination under his last chance agreement.

3.    I find the Grievant's termination due to violation of his Last Chance Agreement was not based on Just Cause.

4.    I find the Union did not grieve the issuance of the "written warning," dated May 21, 2018. *(J.E. No. 3)*. Therefore, the "written warning" still stands.[14]

5.    I find based on the testimony of Ms. Katrina Wainscott, Company Human Resources Manager, that Grievant's Last Chance Agreement is limited to a period of one year from November 1, 2017 to November 1, 2018. The Company has conceded the time limitation for this Last Chance Agreement is one year. Company Counsel stated: "All parties agree, that Dana maintains an LCA for one year." *(Company Brief, p. 3)*. I further find that a one year time limitation period is reasonable under all the circumstances. Therefore, Grievant's Last Chance Agreement has expired.

## VIII.

## AWARD

1.    The grievance is sustained. Grievant's discharge under the Last Chance Agreement was not based on "Just Cause." Grievant's termination is hereby vacated. The Grievant will be reinstated to his former position of Production Team Member (Gasketmaker) effective May 22, 2018.

---

[14] The Union also did not grieve the Written Warning, dated May 22, 2018 *(J.E. No. 3)* concerning Grievant's three occurrences of violating the Company's attendance policy on January 12, March 15 and May 16, 2018. The Union argued there was no penalty for these occurrences at the time. This fact "wipes out the Written Warning for attendance, dated May 22, 2018. Further, the Union conceded the Company's admission that the "attendance write-up" had no bearing on the decision to terminate. *(Union Post Hearing Brief, p. 3-4)*.

2.      The Company is ordered to make the Grievant whole for the loss of his pay, seniority and any benefits related to his termination on May 22, 2018 until the date of his reinstatement.  The Grievant's back pay will be offset by the Grievant's earnings in any fulltime position held from May 22, 2018 to the date of reinstatement.  The Grievant is ordered to cooperate with the Company by disclosing any such earnings during the period from May 22, 2018 to the date of reinstatement.[15]

3.      The Company is ordered to remove any reference or documentation related to Grievant's termination on May 22, 2018 from the Grievant's personnel file except for the "Notice of Corrective Action," dated May 21, 2018. *(J.E. No. 3).*

4.      Grievant upon reinstatement to his former position will not be subject to the Last Chance Agreement, dated November 1, 2017.  *(J.E. No. 4).*

5.      The Arbitrator retains jurisdiction over the remedy portion of this Award and any disputes arising therefrom for sixty (60) calendar days after the date of this Award.[16]

6.      The Company as the loser of this arbitration case shall pay the cost of the Arbitrator's services and expenses pursuant to Article 26, "Collective Agreement," *(J.E. No. 1, p. 58).*

---

[15] The Union has requested interest on back pay.  The Union has not cited any provision in the "Collective Agreement," *(J.E., No. 1)* supporting its request.  The awarding of interest on back pay is not considered customary in the industrial relations forum.  Therefore, arbitrators generally do not award interest on back pay.  MARVIN F. HILL, JR. and ANTHONY V. SINCROPI, REMEDIES IN ARBITRATION 450 (2nd ed., Bureau of National Affairs, Inc., 1991).

[16] The Company argues that Grievant should not receive any back pay if he is reinstated.  The Company argues that Grievant has failed to mitigate his alleged damages citing *McLouth Steel Corp.*, 23 LA 640 (Parker, 1954).  Grievant allegedly could have sought employment in higher paying manufacturing positions.  Instead, Grievant was employed in automotive repair, at a lesser rate of pay.  *(Company Brief, p. 13).*  If the parties cannot resolve this dispute as to the amount of back pay, either or both parties may request an additional decision concerning the amount of back pay after providing relevant evidence and written argument during the sixty (60) calendar day period after the date of this award.

Dated: October 17, 2019.

DANIEL M. KININMONTH
ARBITRATOR